**Charles and Katherine BUCKNER, husband and wife, Appellants,**

v.

**Roxie CASTRO, Respondent.**

**No. SD 29780.**

Missouri Court of Appeals,
Southern District,
Division One.

Feb. 24, 2010.

Motion for Rehearing or Transfer Denied
March 18, 2010.

Application for Transfer Denied
April 20, 2010.

Richard T. Ashe, Branson, for Appellants.

Thomas W. Millington and Taylor C. Moore, Millington, Glass & Love, Springfield, for Respondent.

## ROBERT S. BARNEY, Judge.

Charles Buckner ("Mr. Buckner") and Katherine Buckner ("Mrs. Buckner") (collectively "Appellants") appeal the judgment of the trial court which denied their request for a prescriptive easement and attendant injunctive relief relating to land owned by Roxie Castro ("Respondent"). The area in dispute is a pathway ("the Lane") approximately 660 feet in length which is located along the southernmost border of Respondent's property, adjoins the easternmost north-south line of Appellants' property, and leads to Farm Road 229 in Greene County, Missouri.[1] In its judgment, the trial court determined that Appellants had failed to prove the "adverse nature of their use" preliminary to establishing a prescriptive easement and were not entitled to a presumption of ad-versity due to the rural nature of the land. Further, the trial court found that even if a prescriptive easement had been created: (a) it would have been extinguished by ten years of non-use; (b) there was an intent to abandon manifested by two decades of non-use; and (c) as set out in Respondent's counterclaim, even if a prescriptive easement had been established, it was extinguished through the adverse possession of the Lane by Respondent and her predecessor in title from 1991 to 2004.

The record reveals Appellants and Respondent are neighboring landowners in the rural northern portion of Greene County, Missouri. In 2005, Appellants purchased a rectangular sixty-acre tract of land ("the Buckner Property") which adjoins the easternmost boundary of their already existing two-hundred-forty-acre farm. Prior to their purchase of the property in 2005, Appellants had leased the Buckner Property since approximately 1996 or 1997. The record further shows that Respondent owns a five-acre tract of land which lies between the Buckner Property and Farm Road 229. Respondent purchased the five-acre tract in 1998 from Joe Goddard ("Mr. Goddard").

On January 17, 2007, Appellants filed their "First Amended Petition to Quiet Title and Enforce Prescriptive Easement" against Respondent.[2] In their peti-

---

1. Approximately twenty-feet wide, the Lane was at one time bordered on each side by barbed wire fences; however, the northernmost fence is now dilapidated and no longer functional.

2. "The law does not favor prescriptive easements, and the plaintiffs must show the elements are met by clear and convincing evidence." *Reardon v. Newell,* 77 S.W.3d 758, 761 (Mo.App.2002). "To establish a prescriptive easement, it is necessary to show use that has been continuous, uninterrupted, visible and adverse for a period of ten years." *Whittom v. Alexander–Richardson P'ship,* 851

S.W.2d 504, 509 (Mo. banc 1993). "Adverse use is a ... complex concept." *Johnston v. Bates,* 778 S.W.2d 357, 361 (Mo.App.1989). As employed in this context, " '[a] use is adverse when it is (1) not made in subordination to the owner, (2) wrongful, or may be made by the owner wrongful, as to him, and (3) open and notorious.' " *Smith v. Chamblin Props., LLC,* 201 S.W.3d 582, 587 (Mo.App. 2006) (quoting *Johnston,* 778 S.W.2d at 361–62). " '[I]t is only necessary for the use to proceed without recognition of the owner's authority to permit or prohibit the use; it is not necessary that the user intend to violate

tion, Appellants asserted that in the past Appellants and their predecessors in interest "have maintained or improved the [Lane]," and that Appellants and their predecessors in title "have used the [Lane] for more than 40 years to provide access from their real estate to Farm Road 229 for the purpose of ingress and egress." They sought "a judgment and decree stating and holding that they are the owners of an easement by prescription over [Respondent's] property, and that [Respondent] be permanently enjoined from obstructing that roadway easement...."

Respondent posed affirmative defenses setting out that the Lane had not been used as a roadway for a period of about thirty years by Appellants or their predecessors in interest, and to the extent they may at one time have had any right to use the Lane, these rights and the Lane had been abandoned due to lack of use. Furthermore, reflecting her affirmative defenses, Respondent filed a counterclaim against Appellants in which she asserted there had been no use of the Lane by Appellants or their predecessors in interest for such a length of time that any roadway that may have existed was now abandoned; that Respondent and her predecessors in interest claimed her entire five-acre property to the exclusion of all others and there were no easements, claims of right of ingress or egress, or other similar encumbrances on her property; that Respondent and her predecessors in interest have "maintained exclusive use of possession of the entire five[–]acre tract;" and that such use has "been open, continuous, notorious, and under claim of right, title and ownership ..." for a period of time in excess of ten years such that "[a]ny right of ingress and egress which may have existed at any point in time on

the part of [Appellants] or [their] predecessors in title has been adversely possessed by [Respondent], or her predecessors in title." Therefore, Respondent prayed that the trial court declare her to be the owner of the entire five-acre tract "including all parts thereof, and without being subjected to any right of claim of use on the part of [Appellants] for the purposes of ingress or egress, or otherwise and quieting title in [Respondent]...."

A bench trial was held November 6, 2008, and as previously related, in its Findings of Fact and Conclusions of Law and Judgment, the trial court found the issues in favor of Respondent.

Appellants now assert four points relied on. In Point I they maintain the trial court erred in denying their claim for a prescriptive easement for failure to show "adversity." Specifically, they assert "that a particular use of another's land ... normally justifies a finding that the use has been adverse" such that they were entitled to a "presumption of adversity" based on Appellants' predecessor's continuous, uninterrupted and visible use of the Lane for more than ten years. They also maintain that this presumption was not extinguished by application of the "wild land exception," alluded to by the trial court when it determined Appellants were not entitled to a presumption of adversity due to the rural nature of the land because the foregoing exception had no application in the instant matter in that Respondent's property is located in "well[–]settled Greene County."

In Point II, Appellants premise error on the trial court's determination that Respondent had extinguished the prescriptive easement over the Lane by her adverse possession "in that the evidence presented by [Respondent] showed no more than sev-

the owner's rights.' " *White v. Ruth R. Millington Living Trust,* 785 S.W.2d 782, 785 (Mo.

App.1990) (quoting *Johnston,* 778 S.W.2d at 362).

en years of exclusive possession of the [L]ane." In Point III, Appellants maintain the trial court erred in finding in favor of Respondent's affirmative defense of abandonment since there was no probative evidence of intentional abandonment. Lastly, in Point IV, Appellants assert the trial court erred when it found in favor of Respondent's affirmative defense that the easement had been extinguished by nonuse because the trial court had erroneously declared the law, its finding was not supported by substantial evidence, and it was against the weight of authority. Appellants maintain the trial court erred in concluding that ten years of non-use alone, without an intentional act of abandonment, is sufficient to extinguish an easement by prescription and in finding that the easement had not been used by Appellants or their predecessor for a continuous period of twenty years.

 "In a court tried case, the decision of the trial court should not be reversed 'unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law.'" *Smith v. Chamblin Props., LLC*, 201 S.W.3d 582, 586 (Mo.App.2006) (quoting *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)); *see* Rule 84.13(d), Missouri Court Rules (2009). "'We view the evidence and permissible inferences therefrom in the light most favorable to the judgment and disregard all contrary evidence and inferences.'" *Kirkpatrick v. Webb*, 58 S.W.3d 903, 905 (Mo.App.2001) (quoting *Anderson v. Mantel*, 49 S.W.3d 760, 763 (Mo.App. 2001)). "'Credibility of witnesses and the weight to be given their testimony is a matter for the trial court, which is free to believe none, part, or all of any witness's testimony.'" *Kirkpatrick*, 58 S.W.3d at

905–06 (quoting *Black v. Simpson*, 4 S.W.3d 175, 177 (Mo.App.1999)).

 This Court "'is primarily concerned with the correctness of the trial court's result, not the route taken by the trial court to reach that result.'" *Basham v. City of Cuba*, 257 S.W.3d 650, 653 (Mo. App.2008) (quoting *Bus. Men's Assur. Co. v. Graham*, 984 S.W.2d 501, 506 (Mo. banc 1999)). "'Thus, the judgment will be affirmed if cognizable under any theory, regardless of whether the reasons advanced by the trial court are wrong or not sufficient.'" *Id.* (quoting *Bus. Men's Assur. Co.*, 984 S.W.2d at 506).

Accordingly, even assuming the trial court erred when it determined Appellants were not entitled to a prescriptive easement as asserted in their Point I, it is our view that the trial court did not err in its determination that any existing prescriptive easement was extinguished by the adverse possession of the Lane by Respondent. Point II is dispositive of this appeal. We need not review Points I, III or IV, as they are moot and do not affect the ultimate outcome of this case.

In their second point relied on Appellants maintain the trial court erred in finding in favor of Respondent on her claim for adverse possession because "the judgment erroneously applied the law and . . . is not supported by substantial evidence, in that the evidence presented by [Respondent] showed no more than seven years of exclusive possession of the Lane."

 "An easement can . . . be extinguished by adverse possession." *Creech v. Noyes*, 87 S.W.3d 880, 885 (Mo.App. 2002); *see also Franck Bros. Inc. v. Rose*, 301 S.W.2d 806, 811 (Mo.1957). In this connection, "[a]n easement can be extinguished by an 'occupation on the part of a person other than the owner of the easement adverse to the right claimed, in con-

nection with nonuse[ ] by the owner of the easement.'" *Nolte v. Corley,* 83 S.W.3d 28, 34 (Mo.App.2002) (quoting *Loumar Dev. Co. v. Redel,* 369 S.W.2d 252, 257 (Mo.1963)). "The possession must be (1) hostile and under a claim of right; (2) actual; (3) open and notorious; (4) exclusive, and (5) continuous for a period of ten years." *Id.; see also Boyles v. Mo. Friends of Wabash Trace Nature Trail, Inc.,* 981 S.W.2d 644, 650 (Mo.App.1998).

"To show use is hostile or open and notorious, it must have been calculated to give notice to the dominant tenant the user was exercising 'exclusive dominion and control over this strip of land, under claim of title, adversely to any claim of [the dominant tenant] or anyone else.'" *Frain v. Brda,* 863 S.W.2d 17, 19 (Mo.App.1993) (quoting *Loumar,* 369 S.W.2d at 257). "Adverse use and claim of right are similar elements. A use is not adverse if the user recognizes the authority of the dominant tenant to prevent or prohibit such use." *Id.* "A claim of right is demonstrated as a 'nonrecognition of the owner's authority to permit or prevent such use.'" *Id.* (quoting *Fenster v. Hyken,* 759 S.W.2d 869, 870 (Mo.App.1988)). Further, "[a] claimant's period of adverse possession may be tacked to his predecessors in title to establish the requisite ten-year period." *Nolte,* 83 S.W.3d at 34. "The burden of proving each element by preponderance of the evidence is on the party claiming adverse possession, and failure to prove even one element defeats the claim." *Id.; see also Creech,* 87 S.W.3d at 885–86.

As previously related, "[t]his [C]ourt defers to the trial court's findings of fact, due to the superior ability of the trial court to judge the credibility of the witnesses." *Nolte,* 83 S.W.3d at 33. "All evidence and permissible inferences favorable to the prevailing party are accepted as true, while all evidence and inferences to the contrary are disregarded." *Id.* "'Conflicts in the evidence are for the trial court to resolve and the facts must be taken in accordance with the result reached.'" *Thomas v. King,* 160 S.W.3d 445, 450 (Mo. App.2005) (citation omitted).

Appellants presented evidence that Maurice Butler ("Mr. Butler") purchased the Buckner Property in 1970 and that at that time the only access to the Buckner Property was via the Lane. Mr. Butler also related that in 1970 he and his father installed two concrete posts at the west end of the Lane "so [they] could have a gate there to control [their] cattle." He stated that at the time of his purchase the Lane was "a well-traveled, well-worn private road," and although his family did not reside on the property, they utilized the Lane about once per week in the 1970's. He further stated that by the 1990's the Lane "was less and less traveled . . . it ha[d] more of a natural look, but [was] still a well-recognizable lane . . . you could easily use." He related that throughout the 1990's until 1995 or 1996, when he leased the Buckner Property to Appellants, he would use the Lane "six to ten times a year" to check fences and things of that nature.[3] He stated there were no other gates or restrictions on the Lane during the 25 year time period he was utilizing the Buckner Property; no one ever prevented him from using the Lane; the

---

**3.** Mr. Butler also testified that prior to Appellants leasing the Buckner Property, he had given them permission to utilize the Lane and a portion of his property during their annual wagon train so that they could get from County Road 229 to their dairy operation on their property to the west. He also noted that because he owned other property adjoining the Buckner Property he rarely used the Lane to access his property and typically accessed the Buckner Property another way.

brush and weeds growing in the Lane were easily driven over; and, despite trees and vegetation encroaching, the Lane was "open enough" that it was navigable in a pickup truck.

Mr. Buckner testified that he had resided on his family's large farm for sixty years and that he purchased the sixty-acre tract referred to as the Buckner Property in 2005. He related he grew up utilizing the Lane on foot, in vehicles, on horseback, and on tractors. Further, he related that for the previous thirty-one years he had spearheaded an event called the Fair Grove Historical Society Ride which involves a large wagon train, lasts approximately five days, and covers over one hundred miles. He stated the wagon train had been utilizing the Lane since the Buckner Property had been owned by Mr. Butler and it continued to use the Lane every September except for 2002 and then 2005, 2006, and 2007 after Respondent "put a cable across the [Lane]."[4] He related that in addition to using the Lane for the yearly wagon train, he utilized the Lane "a couple of times a year" from the time he was leasing the Buckner Property until trial. Mr. Buckner also testified that about once a year he "bush hogged [the] whole trail" and removed the "pretty high" "weeds and buckberry ..." that were growing in the center of the Lane. He related that in 2005 he had bushhogged the Lane and then two days later Respondent placed a cable across the Lane at the county road entrance. He also stated that up until the time Respondent placed a cable across the Lane, there were never any gates or other impediments on the Lane except for a wire gate between some concrete posts on the western end of the Lane at the entrance to the Buckner Property. Mr. Buckner admitted he had asked Respondent's predecessor in interest and a few other landowners about obtaining an easement for access to County Road 229, but nothing had ever been settled.

Mrs. Buckner testified that she had traversed the Lane in a pickup truck with Mr. Buckner in 2003.

Marvin Keller testified that in the 1970's and 1980's he utilized the Lane "a lot times" when he was hunting and doing bush hogging work and estimated he had traveled that pathway over twenty times. He stated he and his wife drove down the Lane in 2005, so that he could show her the Buckner Property and there was only the wire gate at the entrance to the Buckner Property blocking the Lane. He related he had never seen the Lane blocked off in any other manner in the forty plus years that he had been familiar with it.

On the other hand, Mr. Goddard testified he purchased twenty acres bordering County Road 229 in 1991, and he sold Respondent, who is his sister-in-law, the southernmost five acres of that tract in 1998. He stated that when he owned Respondent's property he did not maintain the Lane and the area surrounding it so that it would maintain a "wild" "woodsy" appearance which would encourage game and wildlife to reside in the area and that Respondent, likewise, had not maintained the Lane for the same reasons. He also related that since 1991 no one had ever asked his permission to utilize the Lane and if they had done so, he would not have granted them permission. He stated that when he purchased the property, the Lane

4. There was testimony at trial by James Atteberry, Larry Dishman, Mark Moller, Orville Lee Jackson, Clarence Koch, Steven Hedgepeth, Beatrice Hammer, Charles Quillen, and Gerald Burk that the wagon train had passed through the Lane in the ten years prior to trial; however, there was no uniformity expressed as to when the wagon train utilized the Lane or how many times it was routed through the Lane.

"was pretty much grown up" such that "[t]here were large saplings in there and some smaller trees ...," and that at some time during that same year he placed four strands of barbed wire across the east entrance to the Lane where it meets the county road. He acknowledged that at some point in time there had been "some sort of a fence" along the north side of the Lane. When asked what type of fence it was Mr. Goddard responded, "not much" of a fence and he said it was composed of three or four strands of barbed wire which he never maintained. He acknowledged that it was on the ground at places; "over half of it you could step over;" and there were trees growing up through the fence. He also stated that when he purchased his property in 1991, there was a gate across the Lane on the west end. He further related that he removed the four strands of barbed wire at the east end of the Lane in 1998, when Respondent was building a home on her property, but that prior to that time, the Lane had been closed off since 1991. He acknowledged that from 1991 to 1998 when he sold the southern five acres to Respondent, he had never had any problem with anyone using the Lane; and he did not have anyone claim to use the Lane or otherwise assert a right to use the Lane.

He also stated there were only two or three occasions that he ever saw or heard of anyone utilizing the Lane. He related that on one occasion in 2004 or 2005 one of Mr. Buckner's daughters had parked in the Lane while she was hunting; Mr. Goddard confronted her about being on property that was not owned by her family; and she left the property. He also stated that on another occasion in 2005, he was informed by a neighbor that Mr. Buckner had removed the cable he had placed across the Lane, and in response Mr. Goddard posted a "No Trespassing" sign on the Lane. Mr. Goddard also related that

approximately four years prior to the trial in this matter he and Mr. Buckner had discussed Mr. Buckner's desire for an easement over the northern edge of his property. Mr. Goddard declined to grant him an easement and Mr. Buckner then inquired about obtaining an easement from Respondent across her property, to which Mr. Goddard replied he highly doubted Respondent would grant him an easement. He stated that approximately a year after the discussion about an easement he and Mr. Buckner had "a heated discussion" regarding Mr. Buckner's lack of a right to use the Lane, and that trees had been cut down in the Lane after his discussion with Mr. Buckner.

Mr. Goddard admitted he was aware of Mr. Buckner's annual wagon trains utilizing a pass to the *north* of his property on a yearly basis, but he did not know they had been utilizing the Lane. He recalled seeing the wagon train pass in front of his home on the county road one year, but he was certain the wagon train did not utilize the Lane to return to Appellants' farm because "it would have been obvious if the wagon train had gone through there" and when he looked at the Lane it was clear they had not passed down the Lane. He stated that based on the wooded nature of the area and the location of his house in relation to the Lane he admittedly was unable to hear what was occurring in the area of the Lane unless there was a big commotion.

Lastly, on re-direct examination, Mr. Goddard acknowledged that while he had not walked all the way from one end of the Lane to the other more than perhaps two times, nevertheless, he had walked on the Lane on numerous occasions. He also traversed the Lane after Mr. Buckner had cut various trees from several portions of the Lane. He related that prior to Mr. Buckner cutting down some trees, he did

not think it would have been possible to drive down the Lane as many of the trees that had been cut down were "five, six, up to nine and ten inches in diameter."

Jack Alleger, a neighboring landowner to both parties, testified that he purchased his property in 1978, and he attempted to traverse the Lane around that time, but was unable to proceed more than two or three hundred feet "without ... running into things [he] wouldn't want to drive [his] truck over" so he turned back. He related that several years later he traversed the Lane on foot when he was squirrel hunting and it was "worse than it was in '78, it was grown up even more." He related that as far as he knew the Lane had continued to grow up and remained impassable regardless of the mode of transportation. While testifying that it was probably 1982 when he last walked the Lane, he indicated he had driven by the Lane and "would have noticed if the brush and the weeds and the stuff like that was mashed down from wheels coming up through there." He also testified he had never seen anyone using the Lane since he had been residing in the area and that although "you could distinguish that there was at one time a Lane there ..." it appeared to be "just a vacant lane."

Respondent testified that when she purchased her property in 1998, the Lane and the entire five-acre tract were "overgrown" with trees and bushes such that she had to clear land in order to construct her home. She related she moved to that particular area because she "always wanted to live in the woods in the country ..." and she even prevented Mr. Goddard from cutting down some of her trees because she "wanted to keep as many as [she] could." She stated she never gave anyone permission to use the Lane in any manner and she would not have done so had she been asked. Indeed, she acknowledged that from 1998 until Mr. Buckner used a chain saw to clear trees from the Lane in 2004, she did not know of anybody ever using the Lane. She also related she utilized the Lane as part of her property; that she often walked on it while surveying the perimeter of her property; and that she maintained it "by leaving it alone." Respondent also testified that in 2004, when she had first seen Mr. Buckner using the chain saw in the Lane she "didn't know why [he] was there...." She related that was also the only occasion she saw a vehicle utilizing the Lane. After the chain saw incident, Respondent took photographs of several stumps found in the Lane showing trees with diameters of six to twelve inches and she later identified the photographs in open court. She also related that prior to the time when Mr. Buckner used a chainsaw on the Lane, the Lane contained much larger trees and brush. Respondent further stated that in 2005 she had asked Mr. Goddard to help her block off the Lane with a cable to "prevent any further use of it." Prior to that time, she felt there had not been a need to prevent anyone from accessing the Lane.

The trial court found:

[w]hen [Mr.] Goddard purchased the property in 1991, he maintained the gate at the western end of the [L]ane and blocked off the eastern end of the [L]ane with a four-strand barbed wire fence. The court concludes that, under these facts, [Mr.] Goddard's possession of the [L]ane was hostile and under a claim of right, actual, open and notorious, exclusive, and continuous until he sold the southern five acres of his property to [Respondent] in 1998. Upon her purchase of the property, [Respondent] continued to maintain the [L]ane in its natural state by allowing it to grow so that her property could continue to provide homes to all the woodland creatures.

Her possession was not interrupted until 2004. [Respondent's] six years of adverse possession can be tacked to [Mr.] Goddard's seven years of adverse possession to establish the requisite ten-year period. The court concludes that, in connection with the non[-]use of the [L]ane, the testimony of [Mr.] Goddard and [Respondent] established that, even if an easement had been established, it was extinguished through the adverse possession of [Mr.] Goddard and [Respondent] for a period of ten years spanning from 1991–2004.

 Here, Appellants' arguments to the contrary appear to center around the weight to be given to the testimony of Respondent's witnesses, and Appellants appear to ask this Court to reweigh the evidence. We are mindful, however, that the credibility of witnesses and the weight to be given their testimony is a matter for the trial court. *Kirkpatrick*, 58 S.W.3d at 905. This Court cannot say the trial court's judgment is contrary to the weight of the evidence presented at trial. *See Murphy*, 536 S.W.2d at 32. While there were conflicts in the testimony, including evidence of other persons utilizing the Lane, "this does not mean that mere 'sporadic use, temporary presence or permissive visits by others (including the title holder)' will negate this element and defeat a claim of adverse possession." *Nolte*, 83 S.W.3d at 35 (quoting *Flowers v. Roberts*, 979 S.W.2d 465, 470 (Mo.App.1998)).

Lastly, this Court observes that "[c]onflicts in the evidence were for the trial court to resolve, and the facts must be taken in accordance with the result reached." *Thomas*, 160 S.W.3d at 450. "[W]e are bound by the trial court's factual findings if such findings are supported by substantial evidence." *Gibson v. Adams*, 946 S.W.2d 796, 800 (Mo.App.1997). Viewing the evidence and permissible infer-

ences in a light most favorable to the judgment, *Anderson v. Mantel*, 49 S.W.3d 760, 763 (Mo.App.2001), we cannot say the trial court erred when it determined that any interest Appellants may have had in the Lane was extinguished by the fact that Respondent and her predecessor in interest adversely possessed the Lane for the statutory period of time. The trial court's judgment is supported by competent and sufficient evidence. *See Nolte*, 83 S.W.3d at 36. Point II is denied.

The judgment of the trial court is affirmed.

BATES, P.J. and BURRELL, J., Concur.