**SLEEPY HOLLOW RANCH LLC, and Estate of Buenos C. Blunk, and Buenos C. & Mary M. Blunk Living Trust, dtd 8–18–03, Appellants/Cross–Respondents,**

v.

**Priscilla ROBINSON, Respondent/Cross–Appellant,**

and

**Joe A. Blunk and Donna Blunk, Respondents.**

Nos. SD 30657, SD 30687, SD 30666, SD 30686.

Missouri Court of Appeals, Southern District, Division Two.

April 17, 2012.

---

**5.** The issue of the timeliness of the revocation hearing is moot. *See Cline*, 142 S.W.3d at 224.

486

Richard L. Schnake & Daniel K. Wooten, Neale & Newman, L.L.P., Springfield, and Timothy S. Davis, Branson, for Appellants.

Henry S. Clapper, Clapper & Harris, LLC, Branson, for Respondent Patricia Robinson.

Greggory D. Groves, Lowther Johnson, LLC, Springfield, for Respondents Blunk.

ROBERT S. BARNEY, Judge.

In this consolidated appeal, Sleepy Hollow Ranch, LLC, the Estate of Buenos ("Jim") C. Blunk ("the Estate"), and the "[Jim] & Mary M. Blunk Living Trust, dtd 8–18–03" ("the Trust") (collectively "Appellants") appeal from the trial court's "AMENDED JUDGMENT."[1] They bring five points of trial court error based on the trial court's determination of issues in favor of Priscilla Robinson ("Ms. Robinson") on Appellants' claims to set aside deeds to her made by Jim which granted fee simple title to the "Mark Twain house" and the "Homeplace" on the basis of her exercise of undue influence over Jim; on the basis of the invalidity of the deed transfer to the Homeplace originally made between Jim and the "College of the Ozarks," a fictitious name for School of the Ozarks, Inc. ("the College"); and the determination that Joe ("Joe") and Donna ("Donna") Blunk (collectively "Respondents Blunk") acquired fee simple title to the Homeplace by virtue of adverse possession. Further, Ms. Robinson appeals from the trial court's amended judgment and raises four points relied on premising error on the trial court's award of $100,000.00 in favor of Appellants on their

---

1. We use first names throughout the opinion for the sake of clarity. We mean no disrespect.

claim she wrongfully took $100,000.00 in gold from Jim. She further premises error in the trial court's award of $2,500.00 to Appellants on their claim against her for the wrongful taking of a certain 1972 pick-up truck and in finding that Respondents Blunk were entitled to fee simple ownership of the Homeplace based on adverse possession.

Viewing the record in the light most favorable to the trial court's judgment, *Schroeder v. Proctor*, 280 S.W.3d 724, 726 (Mo.App.2009), the record reveals Jim was Ms. Robinson's uncle. Jim and Ms. Robinson were close in the 1950's but did not have much contact again until the late 1990's.[2] At that time, Jim visited Ms. Robinson on two occasions at her home in Mississippi and she visited him at his home in Arizona on one occasion. At some point thereafter, Jim told Ms. Robinson he intended to purchase property in Missouri where he planned to reside, at least on a part-time basis; he invited her to live there with him; and requested she help in his care as he was suffering from prostate cancer. In September of 2004 Ms. Robinson went to Arizona, helped Jim pack his belongings, and when they returned to Missouri they moved into a home Jim had purchased in 2003, referred to in the record as the Mark Twain house.[3] Jim was eighty-six years old at that time.

Jim rented a safety deposit box jointly with Ms. Robinson to which only they had access and the bank records reveal the box was only accessed by Ms. Robinson. Around the same time Jim opened a joint checking account with Ms. Robinson into which he deposited $50,000.00 from his account in Arizona. While Jim was away in Arizona, he instructed Ms. Robinson to pay his bills and other expenses from this account and she did so. During this period of time, Jim stayed at the Mark Twain house "off and on" with Ms. Robinson taking care of the property and the animals when he was away.

On May 2, 2004, Jim entered into a written option to buy the second piece of property at issue in this lawsuit which is referred to in the record as the Homeplace. The Homeplace had previously been in the family for a number of years and Jim's brother, Oren Blunk ("Oren"), had previously owned it.

In 1976, Oren's son and his wife, Respondents Blunk, moved into a home on the 77.5 acre Homeplace. Respondents Blunk never received title to the property as it passed upon Oren's death to Tessie Lombard ("Tessie"), sister to Oren and Jim. Respondents Blunk continued living on the Homeplace despite certain issues that had arisen with Tessie, and they remained on the property even after it was deeded by Tessie on October 3, 1998, to the College. On November 17, 1998, the College notified Respondents Blunk that they needed to lease or rent the property or the College would be forced to explore "other options." After several years of negotiations, Jim apparently intervened in the situation and signed a five year lease on the Homeplace with the College.

In April of 2005, Jim moved the majority of his belongings from Arizona to the Mark Twain house and began residing there full-time. On May 6, 2005, Jim then executed his option to purchase with the

---

**2.** Although he grew up in Stone County, Missouri, Jim spent the majority of his adult life residing in Phoenix, Arizona. Apparently he was a successful businessman. His wife, Mary Margaret Blunk, is deceased and the couple had no children.

**3.** Although the Mark Twain house was purchased on June 3, 2003, prior to the creation of the Trust, there does not appear to have been any attempt by Jim to have the Mark Twain house placed in the corpus of the Trust.

College and purchased the Homeplace for $85,000.00. The grantor on this deed was "School of the Ozarks, Inc., d/b/a College of the Ozarks" and the grantee was "Sleepy Hollow Ranch." Articles of Incorporation for Sleepy Hollow Ranch, LLC were then filed two months later on July 8, 2005. In October of that year, Jim instituted eviction proceedings against Respondents Blunk to remove them from the Homeplace by way of an action for ejectment and trespass.[4]

Also in 2005, Jim became involved with a woman from Arkansas, Shirley Peglar ("Shirley"), and the two went on several extended vacations prior to purchasing a home together in Arkansas at some point in time that year. After returning from a cruise and a trip to Arizona with Shirley in the beginning of January of 2006, Jim became concerned that Shirley would "attach herself" to his assets. As a result, he phoned Ms. Robinson or Mrs. Howard in late January and asked them to aid in his return to Missouri. The record shows that when Jim returned from Arkansas, he "was not in good shape." He was dehydrated, had poor balance, and his diagnosed prostate cancer was taking its toll on his overall health; however, his mental acuity was apparently intact. Ms. Robinson and Mrs. Howard then took certain steps, purportedly at Jim's request, to "protect" his assets from Shirley, whom they believed had been taking advantage of Jim. Ms. Robinson and Mrs. Howard cancelled his credit cards, changed his

checking account information, and removed items from the safety deposit box.[5] Jim executed a durable power of attorney at that time granting Mrs. Howard power of attorney upon his disability. On January 26, 2006, Jim was transported by ambulance to Skaggs hospital for severe back pain and dehydration.

On February 15, 2006, Mrs. Howard drove Jim to the office of his attorney, Russ Schenewerk ("Mr. Schenewerk"), and informed Mr. Schenewerk that Jim wanted to deed the Homeplace and the Mark Twain house to Ms. Robinson. After speaking with Jim and deciding that such an action was not what Jim truly desired, Mr. Schenewerk declined to prepare the deeds although he noted Jim appeared mentally competent on that day.

Two days later Jim received the results of medical tests that had been performed earlier in the week. He was told on February 17, 2006, that he had "widespread bony metastisis consistent with . . . history of prostate [cancer]" and was advised that he needed to look into hospice care. On February 21, 2006, Ms. Robinson took Jim to see attorney George Scott ("Mr. Scott") about deeding the Homeplace and the Mark Twain house to Ms. Robinson. Mr. Scott interviewed Jim; found him to be mentally competent; determined he desired to execute the aforementioned deeds; and prepared the deeds in accordance with Jim's request. The deeds were then exe-

---

4. At some point prior thereto, Jim had decided he would like to develop the Homeplace such that he authorized Ms. Robinson; Veda Howard ("Mrs. Howard"), Ms. Robinson's daughter; and Mrs. Howard's husband, Danny Howard ("Mr. Howard"), to begin doing work on the Homeplace property. Joe disapproved of the plan to develop the property and apparently prevented the Howards from doing further work on the Homeplace property.

5. There are also allegations in this matter relating to several items of Jim's personal property being wrongfully appropriated by Ms. Robinson, including several vehicles and $100,000.00 in gold coins that had purportedly been in the safety deposit box. These personal property issues will be addressed more fully below in relation to Ms. Robinson's cross-appeal.

cuted in favor of Ms. Robinson.[6] Around the same time, due to telephone conversations with Jim, Lance Mallow ("Mr. Mallow"), Jim's great nephew, and Jim's sister, Edyth Rahas ("Ms. Rahas"), were growing suspicious of the care Jim was receiving at the hands of Ms. Robinson and Mrs. Howard. Mr. Mallow and Ms. Rahas suspected Ms. Robinson and Mrs. Howard were over-medicating Jim and taking advantage of his wealth. After discussions with Brenda Harms ("Ms. Harms"), a long time friend of the family, it was determined they would remove Jim from Missouri and fly him for treatment at the Mayo Clinic in Phoenix. On February 25, 2006, Ms. Harms flew to Springfield, Missouri; picked up Jim; and flew him back to Phoenix where he was hospitalized for five days. Upon his release from the hospital, Jim moved into a home next door to Ms. Harms.

On March 8, 2006, just weeks after having conveyed both the Homeplace and the Mark Twain house to Ms. Robinson, Jim executed a new will that included a lengthy amendment to the Trust; appointed Mr. Mallow and Ms. Harms as successor co-trustees; declared that he had been "under the influence of certain family members and individuals" that "may have unduly influenced [him]" such that he desired to "revoke and/or modify" the Trust; and specifically set forth that Ms. Robinson "shall NOT receive any property and/or assets [or] cash, of any nature whatsoever, at any time and under any circumstances" from the Trust or the Estate. Jim contin-

ued to reside in Arizona until his death on May 10, 2006. This litigation was thereafter initiated.[7]

The trial in these matters was held on January 5 and 6, 2010. At the close of all the evidence the trial court took the matter under advisement. On June 21, 2010, the trial court entered its lengthy "AMENDED JUDGMENT."

In part pertinent to our review, the amended judgment found Appellants failed to meet their burden of proving the deeds at issue should be set aside for undue influence or lack of capacity. However, the trial court determined Appellants were entitled to a judgment against Ms. Robinson for "possession of the 1969 Volkswagon and the 1979 Ford Pickup, and monetary damages in the total amount of ... $102,500.00[ ] for conversion of the gold and the ... 1972 pickup." It also denied Ms. Robinson's claims against Respondents Blunk because Respondents Blunk owned the Homeplace by adverse possession such that the conveyance of the Homeplace from Tessie to College of the Ozarks to Jim was void. The appeals by Appellants and Ms. Robinson followed.

We shall first address Appellants' points relied on. In Appellants' Points I and II, they maintain the trial court erred in "refusing to set aside the deeds to [Ms.] Robinson to the Mark Twain [house] and the Homeplace" on the basis of undue influence in that such a determination was an erroneous application of the law and

---

6. The deed for the conveyance of the Mark Twain house was between Jim, as an individual, and Ms. Robinson. However, the deed to the Homeplace was drafted with "Sleepy Hollow Ranch" listed as the grantor due to the fact that Jim told Mr. Scott "he held the property [in that name] and that it was his property and that's the name he used and that's the way [he] should prepare the deed. That was his direction." The signature block

on the Homeplace deed reads "SLEEPY HOLLOW RANCH / By: B.C. (JIM) BLUNK" and the acknowledgment portion of the deed indicates Jim was the "owner" of Sleepy Hollow Ranch.

7. We note that while this litigation was pending, the College issued a quit claim deed for the Homeplace to the Estate in early 2009.

was against the weight of the evidence. In support of this argument, Appellants assert there was evidence Ms. Robinson "had a confidential relationship with Jim . . . , she received the deeds, and there was other evidence from which to infer undue influence;" that the presumption of undue influence arose and the burden was shifted to Ms. Robinson to rebut it; that the trial court "did not find [Ms.] Robinson's explanation more plausible than the existence of undue influence;" that, consequently, Ms. Robinson did not satisfy her burden such that the "presumption of undue influence was conclusive;" and that the evidence favors "a finding that [Ms.] Robinson procured the deeds through undue influence."

On appeal of an equitable action to set aside a deed, the trial court's judgment will be sustained unless there is no substantial evidence to support it, it is against the weight of the evidence, it erroneously declares the law, or it erroneously applies the law. *Landers v. Sgouros*, 224 S.W.3d 651, 655 (Mo.App.2007). " 'When reviewing a court-tried case, we view all evidence and inferences in the light most favorable to the judgment and disregard all contrary evidence and inferences.' " *Id.* (quoting *Ortmann v. Dace Homes, Inc.*, 86 S.W.3d 86, 88 (Mo.App.2002)). "We defer to the trial court's determinations as to the credibility of witnesses." *Id.* " 'The trial court's judgment is presumed valid and the burden is on the appellant to demonstrate its incorrectness.' " *Bowles v. All Counties Inv. Corp.*, 46 S.W.3d 636, 638 (Mo.App. 2001) (quoting *Schaefer v. Rivers*, 965 S.W.2d 954, 956 (Mo.App.1998)).

Appellants' first two points relied on are governed by the following principles:

[a] deed procured by the exercise of undue influence [8] is rendered invalid. The test is whether the grantor's free agency and voluntary action were thwarted. While neither direct testimony nor overt acts operating at the moment of the instrument's execution need be shown, the facts and circumstances from which undue influence can be inferred must be proved by clear, cogent and convincing evidence.

The cases recognize that undue influence is seldom susceptible of direct proof and that generally it must be deduced from the circumstances of the particular case. It is necessary that the undue influence be operative at the time of execution of the deed sought to be set aside.

*Landers*, 224 S.W.3d at 660 (internal citations and quotations omitted). Yet, "[a] confidential relationship alone . . . is not enough to raise a presumption of undue influence." *Tobias v. Korman*, 141 S.W.3d 468, 475 (Mo.App.2004). "The 'presumption' is raised when there is a confidential relationship, a deed favoring the one acting in the fiduciary capacity, and some evidence 'from which the Court can infer undue influence[.]' " *Duvall v. Brenizer*, 818 S.W.2d 332, 335 (Mo.App.1991) (quoting *Davis v. Pitti*, 472 S.W.2d 382, 387–89 (Mo.1971)). "The burden is on the plaintiff to prove undue influence." *Ruestman v. Ruestman*, 111 S.W.3d 464, 478 (Mo.App. 2003). "Once established, the presumption makes a prima facie case of undue influence, effectively shifting the burden to the fiduciary to rebut." *In re Estate of Hock*, 322 S.W.3d 574, 579 (Mo.App.2010).

In the present matter, Appellants did not meet their burden of proving a pre-

---

8. " 'Undue influence is defined as overpersuasion, coercion, force, or deception that deprives an individual of h[is] free agency.' "

*Puzzanchera v. Loetel*, 293 S.W.3d 51, 60 (Mo. App.2009) (quoting *Mace v. Loetel*, 166 S.W.3d 114, 117 (Mo.App.2005)).

sumption of undue influence.[9] *See Ruestman*, 111 S.W.3d at 478; *Hock*, 322 S.W.3d at 579. Here, there was evidence that Jim "put a great deal of trust" in Ms. Robinson by allowing her to reside in the Mark Twain house while he lived elsewhere; by jointly opening up a bank account and a safety deposit box with her; by allowing her to write checks on his accounts which only he placed money into; by trusting her to care for his animals and to pay his bills while he was away; and by allowing her to be involved in his medical care and to sign medical paperwork on his behalf. "'A confidential relationship is usually found when the person in whom confidence is reposed had either control or influence over at least a portion of the [other party's] property, finances, or business affairs.'" *Kay v. Kay*, 763 S.W.2d 712, 714 (Mo.App.1989) (quoting *Crane v. Centerre Bank of Columbia*, 691 S.W.2d 423, 429 (Mo.App.1985)). There was clearly a confidential relationship between Jim and Ms. Robinson in the present matter such that the first prong of the presumption test is met.

Second, the deeds at issue from Jim to Ms. Robinson for the Homeplace and the Mark Twain house were clearly to benefit Ms. Robinson such that the second prong of the presumption of undue influence test is met.

However, it is the third prong of the test where this Court feels Appellants fell short of meeting their burden of proof. The third prong requires "some evidence 'from which the Court can infer undue influence[.]'" *Duvall*, 818 S.W.2d at 335 (quoting *Davis*, 472 S.W.2d at 387–89). Further, there must be facts and circumstances tending to show that undue influence was an active factor in the transaction. *Tobias*, 141 S.W.3d at 475. It is not undue influence for the beneficiary to exercise influence as long as it was not so coercive or importunate as to deprive the benefactor of his or her free agency. *Id.* "'The test is whether the grantor's free agency and voluntary action were thwarted.'" *Houston v. Crider*, 317 S.W.3d 178, 183 (Mo.App.2010) (quoting *Pike v. Pike*, 609 S.W.2d 397, 402 (Mo. banc 1980)).

Here, by all accounts, Jim was an intelligent man and a successful businessman. In 2003, years before any issues relating to undue influence arose, Jim asked Ms. Robinson to move to Missouri to live with him in the Mark Twain house. There was no evidence that Ms. Robinson was paid for helping Jim once she resided with him nor was there evidence that she paid him any type of room and board. Also, in the two years that followed, Jim maintained his home in Phoenix and traveled extensively, all the while Ms. Robinson cared for his affairs and property in Missouri. As his health declined, Ms. Robinson provided medical aid to Jim and became engaged in his medical concerns. Jim's medical records in the days prior to the signing of the deeds indicate Ms. Robinson was doing a great deal of work to properly care for him. She continued throughout this time to manage his finances and to have access to his bank account and the safety deposit

---

9. We note that part of Appellants' allegations under these first two points relied on take issue with their assertion that the trial court found the presumption of undue influence existed and that this presumption was not rebutted by Ms. Robinson such that the trial court erred in its findings as a matter of law. The trial court's judgment, while incredibly informative and well-written, does not specifically state whether or not it found the burden of proof was in fact shifted from Appellants to Ms. Robinson. "Our concern on review is whether the trial court reached the proper result, not the route by which it reached that result. A correct decision will not be disturbed merely because the trial court gave a wrong or insufficient reason." *Evans v. Wittorff*, 869 S.W.2d 872, 875 (Mo.App.1994).

box. All of these behaviors by Jim and Ms. Robinson were consistent up until February 26, 2006, when he returned to Phoenix for the last time. In the days leading up to the execution of the deeds at issue on February 21, 2006, it is clear Jim was in ill health although there was little evidence that he was mentally incapacitated. While Mr. Schenewerk declined to execute the deeds on February 15, 2006, because he felt it was not Jim's wish to deed the properties to Ms. Robinson, Mr. Schenewerk did note Jim seemed capable of making such decisions at that time. As noted by the trial court,

> [t]he fact that Jim ... did not want to put the Mark Twain [house] or the Homeplace in [Ms.] Robinson's name a week or so before he discovered he had less than 6 months to live ... does not mean that he did not want to do so on February 21, 2006, the date he actually executed the deeds in the law office of [Mr.] Scott.

Further, there was testimony from Mr. Scott that he felt that on the day Jim executed the deeds it was his desire to deed his property to Ms. Robinson and both Mr. Scott and his paralegal testified to Jim's mental acuity on that day.

This Court, of course, does not ignore the testimony of Mr. Mallow, Ms. Rahas, Ms. Harms and others that Jim was less than happy in Ms. Robinson's care; however, it can be discerned that the trial court gave little weight to that testimony and we "defer to the trial court's determinations as to the credibility of witnesses." *Landers*, 224 S.W.3d at 655. As noted by the trial court, while it is certainly understandable that Appellants might have a basis for suspicions relating to Ms. Robinson, those suspicions do not create an inference of undue influence in this matter. Based on the foregoing, we cannot say Jim's free agency or his ability to engage in voluntary action was thwarted by Ms. Robinson. *Pike*, 609 S.W.2d at 402. Points I and II are denied.

Taking their points out of order for the sake of clarity and the ease of analysis, we turn now to Appellants' fourth and fifth points relied on. In their fourth point relied on Appellants assert the trial court erred in finding Respondents Blunk owned the Homeplace by virtue of adverse possession. They maintain such a ruling was a misapplication of the law in that the trial court failed "to recognize and apply the principle that stronger evidence of adverse possession is required in the presence of a family relationship...." Appellants argue Joe's telephone conversations with Tessie, "which related to her potential use of the Homeplace and the legitimacy of Joe's son, did not constitute notice to her of [Respondents Blunks'] claim to own her property by adverse possession." As an alternative to Point IV, Appellants assert in Point V that the trial court erred in the adverse possession ruling in that the "evidence does not support the judgment" because "once Jim ... intervened, [the College] told Joe ... that he and Donna could live on the Homeplace for as long as they desired, and thus their possession was permissive, not hostile."

■ In reviewing court tried claims regarding adverse possession, "[w]e will affirm the trial court's judgment unless it is unsupported by substantial evidence, [is] against the weight of the evidence, or it erroneously declares or applies the law." *Reynolds v. Brill*, 302 S.W.3d 716, 718 (Mo.App.2010). "[T]he credibility of witnesses and the weight to be given their testimony is a matter for the trial court." *Buckner v. Castro*, 306 S.W.3d 655, 664 (Mo.App.2010).

The record reflects Respondents Blunk moved onto the Homeplace in 1976 and at that time it was owned by Joe's father,

Oren. The Homeplace was later sold to Joe's aunt, Tessie. From that time until at least the time of trial, Respondents Blunk remained on the property, never paid rent to anyone, and usually did not pay property taxes on the property. Tessie visited "[o]nce in a while," and would occasionally instruct them about where trees should be planted and things of that nature but neither she nor Jim ever permanently resided on the Homeplace.

At some point in time in 1990 and again in 1991, Joe had separate telephone conversations with Tessie that are of note. According to Joe, during the first conversation, Tessie told him "she wanted [him] to move from the property," and Joe replied that he "was going to stay where [he] was at." Joe stated he told her he was not going to move because he "was born on the place" and he "felt like it was" his property. During the second conversation, Tessie asked him to move from the property because she "had concerns about the property going to [Respondents Blunks'] son because she believed that [their son] was really not [Joe's] son." [10]

The record further shows that Respondents Blunk cut and sold hay off the Homeplace property; granted easements to utility companies to access the land; cut and sold timber on the property; posted "no trespassing" signs throughout the perimeter of most of the property; ran cattle on the property; leased the greater portion of the property to various individuals on which to run cattle; gave permission for people, including other family members, to reside on the property; and allowed people to fish on the property for a fee all without consulting with Tessie. Respondents Blunk paid all utilities on the home; paid to have a new well drilled; paid for all upkeep and maintenance to the

fencing and buildings until they were too old to continue maintaining the fencing; and paid for all maintenance to the property itself such as brush hogging without obtaining payment or permission from Tessie. Tessie and Respondents Blunk had an amicable relationship during most of this time until at least 1990 when Joe told Tessie he was not moving out, and later when Jim and Joe had a falling out over some business dealings.

 " 'To establish title by adverse possession, one must prove by a preponderance of the evidence that possession was: (1) hostile and under a claim of right; (2) actual; (3) open and notorious; (4) exclusive; and (5) continuous for a period of ten years.' " *Harris Land Dev., L.L.C. v. Fields,* 139 S.W.3d 275, 277 (Mo.App. 2004) (quoting *Weaver v. Helm,* 941 S.W.2d 801, 804 (Mo.App.1997)). " 'Failure to establish one element of adverse possession will defeat the claim.' " *Id.* (quoting *Conaway v. Fauller,* 972 S.W.2d 442, 444 (Mo.App.1998)). "The ten year period to confer title by adverse possession need not occur immediately prior [to] the suit." *Watson v. Mense,* 298 S.W.3d 521, 526 (Mo.2009). " 'Adverse possession presents mixed questions of law and facts, and the principles or elements to prove such a case are considered with the view that every property may be unique and each case must be decided in light of its own unique circumstances.' " *Harris,* 139 S.W.3d at 278 (quoting *Weaver,* 941 S.W.2d at 804–05). " 'The acts which establish possession vary from case to case and the nature of the area in question and the surrounding property.' " *Id.* (quoting *Weaver,* 941 S.W.2d at 805). "The party claiming ownership by adverse possession has the burden of proving his claim by a

**10.** Donna testified that at least one of the conversations with Tessie took place as early

as 1985, and it was then that Joe told her that "no, we're not moving."

preponderance of the evidence." *Watson,* 298 S.W.3d at 526.

■■■ With that being said, there is a greater standard of proof required when the parties involved in an adverse possession claim are family members:

> [t]he general rule is that permissive occupation of a family estate by one or more, but not all, members of the family is so usual and common that acts of occupation thereof to show hostile adverse possession against one another, must be demonstrated by a clear, positive and continued disclaimer and disavowal of title and an unadulterated assertion of adverse right brought home to the true owners for such time as to bar them, by statutory limitations, from asserting their rights. Where there exists a family relationship among the involved parties, that relationship will prevent or rebut a presumption of adverse holding that may arise under similar circumstances involving nonrelated parties. Stronger evidence of adverse possession is required in the presence of a family relationship than where no such relationship exists.

*Tallent v. Barrett,* 598 S.W.2d 602, 606 (Mo.App.1980); *see Poe v. Mitchener,* 275 S.W.3d 375, 380 (Mo.App.2009).

■■■ Here, when Respondents Blunk moved onto the Homeplace in 1976, at a time when the property was still owned by Joe's father, their possession was clearly permissive. However, as the trial court found, between that time and whenever their relationship with Tessie soured, the possession became hostile to the property owner, Tessie. It is settled law that "[p]ossession is hostile if it is antagonistic to the claims of all others" and the claimant "must occupy the land with the intent to possess it as [their] own." *Cooper v. Carns,* 263 S.W.3d 729, 733 (Mo.App.2008). Further, "[t]he claimant's occupancy must be in defiance of, rather than in subordination to, the rights of others" and "[i]ntent may be inferred from [their] acts of dominion over the land." *Id.* Notably, "[t]he claimant need not intend to take away something that belongs to another or be indifferent as to the facts of the legal title;" rather, *"[i]t is the intent to possess rather than the intent to take from the true owner that governs." Id.* (emphasis added, internal citations omitted); *see Charlton v. Crocker,* 665 S.W.2d 56, 61 (Mo.App.1984). Based on the foregoing facts it is clear that, at least by 1990, Respondents Blunk intended to possess the Homeplace as their own and their possession was hostile to the then-owner, Tessie. Respondents Blunk were openly in possession of the property, treated it as if it were their own, utilized its natural properties throughout the 77.5 acres to make money for themselves, maintained it as if they were the record owners and resided there exclusively. Donna testified that Tessie told them as early as 1985 that they needed to move from the property and Joe testified those conversations occurred in 1990 and 1991. At least by 1990 their possession was transformed from permissive to hostile in that they remained on the Homeplace in defiance of Tessie's property rights. Thereafter, Tessie did not visit the Homeplace again and transferred her property rights to the College in 1998 without taking any action to evict Respondents Blunk.

■■■ From 1998 until January of 2003 when Jim signed a lease on the Homeplace with the College, Respondents Blunk continued to reside on the Homeplace with the College's knowledge. During this period of time, the College took no action against them other than sending a letter several months after the property conveyance from Tessie containing what the trial court described as a thinly veiled threat to either

rent or lease the Homeplace or the College would have to explore "other options." Respondents Blunk neither rented nor leased the Homeplace from the College; rather they continued their occupancy of the Homeplace. As such, from 1990 through the beginning of 2003, more than the ten years required for adverse possession, Respondents Blunk were in hostile, actual, open, notorious, and exclusive possession of the Homeplace.[11]

An appellate court defers to the trial court when there is conflicting evidence. *Poe*, 275 S.W.3d at 381. Despite conflicts in the evidence, based on the record before this Court, there is sufficient clear, cogent and convincing evidence to support the trial court's determination that Respondents Blunks' adverse possession of the Homeplace was hostile, under a claim of right, actual, open, notorious, exclusive and continuous for a term of ten years. The trial court did not err in quieting fee simple title in Respondents Blunk.[12] *Reynolds*, 302 S.W.3d at 718. Points IV and V are denied.

In their third point relied on Appellants assert the trial court erred in refusing to set aside the deed granting Ms. Robinson the Homeplace in that such a determination was against the weight of the evidence. In support of this assertion, Appellants argue there was "documentary evidence reflect[ing] an intention that [the College] convey the property to an artificial entity, 'Sleepy Hollow Ranch,' not to Jim ... personally;" that the deed from the College to the artificial entity therefore conveyed nothing such that title remained with the College; and that the Estate, therefore, owns title to the Homeplace by virtue of its later quit claim deed from the College.

Based on our determination in Points IV and V, above, relating to the fact that Respondents Blunk owned the Homeplace by adverse possession, Appellants' asserted error that the deed from the College to Sleepy Hollow Ranch was void has been mooted. Point III is denied.

■ We now turn to Ms. Robinson's cross-appeal in this matter.[13] In Ms. Robinson's first point relied on she maintains the trial court erred in finding she "withheld possession of any gold from [Appel-

11. It is not lost on this Court that on May 6, 2005, the College sold the Homeplace to Jim *as is* for $85,000.00, with no warranty under a special warranty deed per the terms of their real estate sales contract; yet, there was evidence at trial that the Homeplace a few years later had an appraised value of between $227,000.00 and $265,000.00. It can be inferred from the testimony of Rodney Arnold, the Dean of Development at the College, among others, that this reduced price was at least in part due to Respondents Blunks' presence on the property and the issues that their presence could present to the College's use of the property.

12. Appellants are incorrect in their assertion that the trial court failed to recognize the familial relationship between the parties and to apply the relevant case law to such a relationship. The trial court's judgment specifically cited to *Lancaster v. Neff*, 75 S.W.3d 767,

775 (Mo.App.2002), and *Watson*, 298 S.W.3d at 526, and recognized that "[w]hen there is a family relationship among the involved parties, [c]ourts may require stronger evidence of adverse possession because of the difficulty in establishing the element of hostile possession." The trial court also pointed out that the existence of a family relationship did not foreclose the possibility of a successful claim of adverse possession. *Neff*, 75 S.W.3d at 775. We find nothing in the record to lead this Court to believe the trial court failed to apply the law to this case.

13. While we agree with Appellants that Ms. Robinson's brief lacks compliance with the various pertinent Missouri Rules of Court (2011), because this is a cross-appeal brief and the issues set out in her points relied on as well as argument are clearly understood, we shall address her claims *ex gratia*.

lants] because no substantial evidence placed it in her possession." In her second point relied on Ms. Robinson asserts the trial court erred in entering judgment against her and in favor of Appellants in the amount of $100,000.00 as the value of the gold coins "because there was no evidence as to the amount of alleged gold or as to its value either at the time of the alleged taking or at the time of trial." We shall address these points conjunctively.

 Conversion is a tort against the right of possession, whereas replevin is a possessory action to obtain property that is in the defendant's possession. *Lafayette v. Courtney*, 189 S.W.3d 207, 210 (Mo.App. 2006). "The measure of damages for the conversion of personal property is the fair market value at the time and place of the conversion." *Mackey v. Goslee*, 244 S.W.3d 261, 264 (Mo.App.2008). Furthermore, a trial court is "entitled to believe all, part, or none of any witness's testimony." *Hugenel v. Estate of Keller*, 867 S.W.2d 298, 302 (Mo.App.1993). Here, Ms. Harms, Jim's neighbor in Arizona, testified that in 2004 Jim and his sister traveled to Twin Falls, Idaho, and he returned with "$100,000 in gold coins," which he put away in his safety deposit box at the Chase Bank in Phoenix. She also stated Jim stored the gold "in a little bitty box that said used machine parts" on the outside. She related that in 2005 "[w]hen Jim was moving to Missouri, he had gone to the bank.... He picked up the gold [from the bank]. It was packed away in the truck ... to be transported [to Missouri]." Jim later told her in April of 2006 that he had placed the box of gold coins into his safety deposit box in Missouri. On cross-examination, she admitted she had not physically seen the gold coins but that Jim and Ms. Rahas said Jim had $100,000.00 in coins. Ms. Harms also related that she was told a box labeled "machine parts" contained $100,000.00 worth of gold coins.

Ms. Robinson testified she was aware of a small, heavy box with "the words machine parts written on it" that was in the safety deposit box at Stone County Bank to which she and Jim both had joint access. She related she did not "know that [Jim] ever mentioned [that the box contained gold] particularly to [her]." She stated Jim had her place the box in the safety deposit box along with other "packages." She testified that Jim never accessed the safety deposit box after the account was opened and records from the bank revealed that only Ms. Robinson had ever accessed the box. Ms. Robinson also related she "believe[d]" she had "removed the little box [she] described as saying machine parts and given it back to Jim ..." although she was not positive when that was. Ms. Robinson also testified that when she emptied the safety deposit box the small "machine parts" box was no longer located there.

Here, viewing the evidence "in accordance with the result reached[,]" *Hugenel*, 867 S.W.2d at 302, we cannot say the trial court erred when it determined that the Estate was "entitled to possession of the gold and that [Ms.] Robinson has or had possession of the gold and that she has withheld possession of the gold from the Estate and that her withholding of the same was wrongful." The award of $100,000.00 on Appellants' conversion claim was within the range of values testified to at trial, *Theilen v. Theilen*, 847 S.W.2d 116, 118–19 (Mo.App.1992), and the trial court was in a better position to view the credibility of the parties than this Court. Additionally, deference must be given to the trial court's resolution of conflicting evidence. *Coffman v. Powell*, 929 S.W.2d 309, 312 (Mo.App.1996). We are bolstered in our determination to affirm by

the very fact that in its findings of fact the trial court expressly found Ms. Robinson had prevaricated about the existence of a pickup, a photograph of which was introduced into evidence showing the pickup in the garage at the Mark Twain house while Ms. Robinson was living there, and "her evasive answers regarding the whereabouts and existence of the gold. . . ."

Further, Ms. Harms testified that she was told by both Jim and Ms. Rahas that Jim had $100,000.00 in gold coins and that it was placed in a small box marked "machine parts." The box ultimately made its way into the joint safety deposit box of Jim and Ms. Robinson. The bank records show Ms. Robinson was the only person to access the safety deposit box and that she did so on four occasions: July 5, 2005, the day the box was rented; October 13, 2005; January 24, 2006, shortly after Jim returned from Arkansas; and March 27, 2008, the day she closed the box. While Ms. Robinson contends she removed the small box and gave it to Jim at some undetermined time, the trial court apparently believed otherwise. As previously related, "[i]n a court-tried case, the judge has the sole responsibility of determining the credibility of witnesses and whether the court will accept or reject the testimony, in part or in whole." *Green Valley Seed, Inc. v. Plenge*, 72 S.W.3d 601, 603 (Mo.App.2002). There is substantial evidence supporting the trial court's determination that there was $100,000.00 in gold coins in the safety deposit box and that Ms. Robinson had converted the gold coins to her own use, supporting an award of damages for $100,000.00. Ms. Robinson's Points I and II are denied.

In her third point relied on Ms. Robinson maintains the trial court erred in finding judgment in favor of Appellants in the amount of $2,500.00 "in monetary damages for the 1972 pickup because there was no evidence as to the value of said pickup."

Ms. Harms testified that in February of 2006 she saw Jim's 1972 Ford pickup parked at the Mark Twain house and that Ms. Robinson was in possession of the vehicle. She stated she had no idea what had happened to that vehicle since that time. A certificate of title for such a truck in the name of the Trust was entered into evidence at trial. Ms. Robinson denied ever seeing the truck "[u]nless it was the big truck with the flatbed on it" which at some point "somebody from Arkansas . . . took it." When shown a photograph of a truck matching that description in the garage of the Mark Twain house, she did not "recall" ever seeing that vehicle or ever having possession of that vehicle. She noted "[t]here was one [truck] bought to work on the farm, but it was a GMC. . . . I never—I don't pay attention to things like that." There was no other testimony relating to this truck or its value presented to the trial court.

While the trial court's judgment states that "the bank records show[ ] the amounts paid for the various vehicles . . . that [Appellants] claim is being wrongfully withheld by [Ms.] Robinson from the Estate," our review of the copious bank records shows no evidence relating to what Jim or the Estate paid for this vehicle and there is no testamentary or other evidence relating to its value. "The burden of proof of damages rests with the plaintiff." *Boyd v. Lollar*, 985 S.W.2d 403, 405 (Mo.App. 1999). "The trial court was required to determine the fair market value of the converted property at the time of the conversion or within a reasonable time of the conversion." *Mackey*, 244 S.W.3d at 265. Here, Appellants presented no evidence relating to the value of the 1972 pickup such that there was no evidence upon which the trial court could base its valua-

tion of $2,500.00 nor its monetary damage award in the same amount. Ms. Robinson's third point relied on has merit. The trial court's judgment as it relates to the 1972 pickup is not supported by the evidence and is reversed and remanded for a new trial on this issue only. *See Coffman,* 929 S.W.2d at 312.

In her fourth point relied on Ms. Robinson asserts the trial court erred in finding Respondents Blunk were entitled to fee simple ownership of the Homeplace based on adverse possession. She maintains there was insufficient evidence to prove all five required elements of an adverse possession claim. Having already addressed this issue in Appellants' Points IV and V above, we need not address it again. The trial court did not err in finding Respondents Blunk owned the Homeplace by adverse possession. *Reynolds,* 302 S.W.3d at 718. Ms. Robinson's Point IV is denied.

All other points of trial court error not otherwise addressed herein are denied. That portion of the judgment awarding Appellants $2,500.00 from Ms. Robinson as monetary damages for her possession of the 1972 pickup is reversed and remanded for further proceedings. In all other respects the judgment is affirmed.

BATES, J. and FRANCIS, P.J., Concur.