

# MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | |
|---|---|
| MOTORS INSURANCE CORPORATION, | ) |
| | ) |
| | ) |
| Respondent, | ) |
| | ) |
| v. | ) WD87590 |
| | ) |
| AUTOBOT TOWING, LLC, | ) Filed: July 8, 2025 |
| | ) |
| Appellant. | ) |

**Appeal from the Circuit Court of Jackson County
The Honorable Kenneth R. Garrett, III, Judge**

**Before Division Three: Edward R. Ardini, P.J., and
Alok Ahuja and Thomas N. Chapman, JJ.**

Autobot Towing, LLC towed a vehicle owned by Motors Insurance Corporation ("Insurer") to Autobot's storage facility in Independence. Autobot later sold the vehicle for scrap to cover its towing and storage fees. Insurer sued Autobot in the Circuit Court of Jackson County, alleging that Autobot had converted the vehicle. Following a bench trial, the circuit court found in Insurer's favor, and awarded it $35,015 in compensatory damages. Autobot appeals. We affirm.

**Factual Background**

In September 2021, an individual purchased a 2021 Dodge Ram truck from Gladstone Dodge, a vehicle dealership, with a worthless check. When Gladstone Dodge was unable to cash the customer's check, it reported the truck as stolen. In addition to notifying law enforcement, Gladstone Dodge reported the theft to its insurer, Motors Insurance Corporation. Insurer paid Gladstone Dodge $55,722 in insurance proceeds to reimburse it for the value of the stolen truck. Insurer thereby acquired title to the truck, and titled the vehicle in its own name in Michigan on September 16, 2021.

On September 29, 2021, an Independence Police Department officer observed the truck being driven well above the speed limit. The officer pursued the vehicle and ultimately arrested the truck's driver. A check of the truck's Vehicle Identification Number revealed that it was the truck which Gladstone Dodge had reported stolen. The Independence Police Department completed a Crime Inquiry and Inspection Report/Authorization to Tow using Department of Revenue ("DOR") Form 4569. The form authorized Autobot to tow the recovered vehicle. The form identified Gladstone Dodge (which had reported the truck as stolen) as the vehicle's owner. The form also indicated, in summary fashion, that the truck had suffered unspecified damage on both sides.

On October 7, 2021, Autobot sent to Gladstone Dodge a Notice of Tow on DOR Form 4577. Gladstone Dodge made no attempt to redeem the truck.

On October 29, 2021, Insurer learned that Autobot was in possession of the truck. Beginning on November 2, 2021, a Representative of Insurer[1] contacted

---

[1]     Pursuant to § 509.520.1(5), RSMo, we do not provide the names of any non-party witnesses in this opinion.

Autobot on multiple occasions. Representative testified that he informed Autobot that Insurer held title to the truck, and requested that Autobot inform Representative of the outstanding towing and storage charges to be paid to recover the truck. Representative testified that Autobot never provided him with the information he requested.

On November 30, 2021, Autobot sold the truck for $2,500, and retained the sales proceeds.

On January 21, 2022, Insurer filed suit against Autobot in the Circuit Court of Jackson County. Insurer asserted a claim for replevin (later dismissed by the court) and a claim for conversion. Autobot filed a third-party petition against Gladstone Dodge, alleging claims for comparative fault, unjust enrichment, and fraudulent misrepresentation. On November 23, 2023, the circuit court granted Gladstone Dodge's motion for summary judgment. (On appeal, Autobot does not challenge the grant of summary judgment to Gladstone Dodge.)

The circuit court held a bench trial on Insurer's conversion claim on June 24, 2024, at which Insurer's Representative and Autobot's Manager were the only witnesses.

During his testimony, Insurer's Representative testified that the truck was brand new at the time it was stolen, and that the $55,722 which Insurer paid to Gladstone Dodge was "the value that Motors Insurance placed upon the vehicle." Representative also testified concerning a range of values for the truck provided by J.D. Powers Valuation Services, which Representative testified was "a reputable source of valuation of vehicles." A J.D. Powers report for the truck was admitted in evidence without objection. The report listed eleven different values

3

for the truck, ranging from an "Auction/Low" value of $45,015, to a "Clean Retail" value of $66,275.

Autobot's Manager testified that the truck was sold to "[w]hoever was this unlucky person that came in to buy it" in response to a Facebook Marketplace advertisement posted by one of Autobot's managers. Manager considered the truck to be a total loss, and testified that it was only worth scrap value. He testified that the electronically controlled sliding back window was broken; the back of the truck's cab was damaged from backing into something; all of the truck's body panels were damaged; and that the oil pan was broken and all of the oil had drained out of the vehicle, rendering the engine inoperable. Manager testified that a replacement engine for the truck would have cost $18,600, and that a replacement back window would have cost a further $4,500.

Manager also testified that sometime after the truck was towed to Autobot's storage lot, a salesperson from Gladstone Dodge came to the lot to inspect it. According to Manager, the Gladstone Dodge salesperson considered the truck to be totaled, and did not want it back.

Following the bench trial, the circuit court entered its judgment on September 30, 2024. The court found in favor of Insurer on its conversion claim, and awarded it $35,015 in damages, together with post-judgment interest at 7.83%. Although the judgment states that the court "carefully evaluated and weighed the credibility of evidence and testimony provided at trial," the judgment contains no specific findings of fact.

Autobot appeals.

4

**Discussion**

"On review of a court-tried case, an appellate court will affirm the circuit court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Ivie v. Smith*, 439 S.W.3d 189, 198-99 (Mo. 2014). In conducting our review, "[d]eference is paid to the [circuit] court's factual determinations, but this Court reviews *de novo* both the court's legal conclusions and its application of law to the facts." *Singleton v. Singleton*, 659 S.W.3d 336, 341 (Mo. 2023).

"Substantial evidence is evidence that, if believed, has some probative force on each fact that is necessary to sustain the circuit court's judgment." *Ivie*, 439 S.W.3d at 199. "To prevail on the substantial-evidence challenge, [movant] must demonstrate that there is no evidence in the record tending to prove a fact that is necessary to sustain the circuit court's judgment as a matter of law." *Id.* at 200. "When reviewing whether the circuit court's judgment is supported by substantial evidence, appellate courts view the evidence in the light most favorable to the circuit court's judgment and defer to the circuit court's credibility determinations." *Id.* "Appellate courts accept as true the evidence and inferences favorable to the trial court's decree and disregard all contrary evidence." *Id.* (cleaned up). In bench-tried cases, "[t]he circuit court is free to believe any, all, or none of the evidence presented at trial." *Prosecuting Att'y, 21st Jud. Cir. ex rel. Williams v. State*, 696 S.W.3d 853, 862 (Mo. 2024) (citing *J.A.R. v. D.G.R.*, 426 S.W.3d 624, 627 (Mo. 2014)).

In addition, following a bench trial, "[a]ll fact issues upon which no specific findings are made shall be considered as having been found in accordance with the result reached." Rule 73.01(c).

## I.

In its first Point, Autobot argues that the circuit court erroneously applied the law when it found that Autobot converted the truck, because Autobot complied with the requirements of §§ 304.155 and 304.156[2] in disposing of the truck.

Sections 304.155 and 304.156 specify the procedures under which a towing company may acquire title to, and dispose of, an abandoned vehicle. Despite Autobot's claim that it complied with both statutes, the evidence would permit the circuit court to find that Autobot failed to comply with the statutes in at least two significant respects.[3]

## A.

First, the evidence supports a finding that Autobot failed to follow the requirements of §§ 304.155 and 304.156 to identify, and notify, the truck's owner that Autobot was in possession of the vehicle.

Section 304.155 authorizes law enforcement officers to request that a private towing company remove certain abandoned property. In this case, the evidence establishes that Autobot was authorized by the Independence Police

---

[2] Statutory citations refer to the 2016 edition of the Revised Statutes of Missouri, updated by the 2024 Cumulative Supplement.

[3] The parties' briefing does not address the question of which party would have the burden of proof concerning Autobot's compliance with §§ 304.155 and 304.156 (whether proving noncompliance was an element of Insurer's conversion claim, or instead whether compliance with the statutes was an affirmative defense on which Autobot bore the burden of persuasion). We need not decide any burden-of-proof question here. As explained in the text, substantial evidence supports an affirmative finding that Autobot failed to comply with the procedures for disposal of abandoned property specified in §§ 304.155 and 304.156; therefore, even if Insurer bore the burden of proof on these issues, it satisfied that burden.

6

Department to remove the truck from the location where it was abandoned by Gladstone Dodge's customer.

Section 304.155.6 specifies how a towing company should attempt to learn the identity of the owner of the abandoned property.

> Upon the towing of any abandoned property pursuant to this section . . ., the law enforcement agency that authorized such towing . . . shall promptly make an inquiry with the national crime information center and any statewide Missouri law enforcement computer system to determine if the abandoned property has been reported as stolen and shall enter the information pertaining to the towed property into the statewide law enforcement computer system. If the abandoned property is not claimed within ten working days of the towing, the tower who has online access to the department of revenue's records shall make an inquiry to determine the abandoned property owner and lienholder, if any, of record. In the event that the records of the department of revenue fail to disclose the name of the owner or any lienholder of record, the tower shall comply with the requirements of subsection 3 of section 304.156. If the tower does not have online access, the law enforcement agency shall submit a crime inquiry and inspection report to the director of revenue. A towing company that does not have online access to the department's records and that is in possession of abandoned property after ten working days shall report such fact to the law enforcement agency with which the crime inquiry and inspection report was filed.

Section 304.156.1 requires the Department of Revenue to notify the towing company of the results of its records search; the statute then requires that the towing company notify the owner of the abandoned property that the towing company is in possession of the property, and of the charges and procedures for recovery of the property. Section 304.156.1 provides in relevant part:

> Within five working days of receipt of the crime inquiry and inspection report under section 304.155 . . ., the director of revenue shall search the records of the department of revenue, or initiate an

7

inquiry with another state, if the evidence presented indicated the abandoned property was registered or titled in another state, to determine the name and address of the owner and lienholder, if any. After ascertaining the name and address of the owner and lienholder, if any, the department shall, within fifteen working days, notify the towing company.  Any towing company which comes into possession of abandoned property pursuant to section 304.155 . . . and who claims a lien for recovering, towing or storing abandoned property shall give notice to the title owner and to all persons claiming a lien thereon, as disclosed by the records of the department of revenue or of a corresponding agency in any other state.

Sections 304.156.3 and .4 specifies the actions that a tow company must take if DOR's records do not identify the owner of the abandoned property:

3.      In the event that the records of the department of revenue fail to disclose the name of the owner or any lienholder of record, the department shall notify the towing company which shall attempt to locate documents or other evidence of ownership on or within the abandoned property itself.  The towing company must certify that a physical search of the abandoned property disclosed that no ownership documents were found and a good faith effort has been made.  For purposes of this section, "**good faith effort**" means that the following checks have been performed by the company to establish the prior state of registration and title:

(1)      Check of the abandoned property for any type of license plates, license plate record, temporary permit, inspection sticker, decal or other evidence which may indicate a state of possible registration and title;

(2)      Check the law enforcement report for a license plate number or registration number if the abandoned property was towed at the request of a law enforcement agency;

(3)      Check the tow ticket/report of the tow truck operator to see if a license plate was on the abandoned property at the beginning of the tow, if a private tow; and

8

(4)     If there is no address of the owner on the impound report, check the law enforcement report to see if an out-of-state address is indicated on the driver license information.

4.     If no ownership information is discovered, the director of revenue shall be notified in writing and title obtained in accordance with subsection 7 of this section.

Section 304.156.7 permits a towing company to apply to the Department of Revenue for title to the abandoned property if no interest-holder has redeemed the property within thirty days of mailing of the notice required by § 304.156.1. *See generally Amond v. Ron York & Sons Towing*, 302 S.W.3d 708, 713-14 (Mo. App. E.D. 2009) (describing the process for disposition of abandoned property under §§ 304.155 and 304.156).

Substantial evidence would support a finding that Autobot failed to send a notice of tow to the truck's owner "as disclosed by the records of the department of revenue or of a corresponding agency in any other state," as required by § 304.156.1. Substantial evidence would also support a finding that Autobot failed to comply with § 304.156.3 by engaging in a "good faith effort" to identify the vehicle's owner after DOR informed it that the Department's records did not identify the truck's owner.

In its Brief, Autobot contends that its October 7, 2021 notice to Gladstone Dodge satisfied § 304.156.1, even though Insurer – not Gladstone Dodge – was the truck's owner when Autobot sent its notice. Autobot contends that it had the right to rely on the fact that Gladstone Dodge was identified as the truck's owner in the Crime Inquiry and Inspection Report/Authorization to Tow (DOR Form 4569), which was completed by the Independence Police Department. According to Autobot's Brief:

9

The Independence Police Department notified Autobot that Gladstone Dodge was the owner of the vehicle in both the Police Report and the Form 4569. These two documents were completed by the Police Department after a search of the records of the Missouri Department of Revenue. After completing their search of the records of the Missouri Department of Revenue, the Police Department informed Autobot that Gladstone Dodge owned the subject vehicle. Pursuant to Section 304.155(6) RSMo the Police Department represented that it had inquired of the Missouri Department of Revenue and determined that Gladstone Dodge was the owner of the vehicle. Autobot was entitled to rely upon that representation.

Autobot cites nothing in the record to support its factual assertion that the Independence Police Department completed the tow authorization and police report "after a search of the records of the Missouri Department of Revenue." Moreover, although Autobot claims that "[p]ursuant to Section 304.155(6) RSMo the Police Department represented that it had inquired of the Missouri Department of Revenue," nothing in § 304.155.6 requires a law enforcement agency to check DOR records before authorizing a towing company to remove abandoned property. Instead, § 304.155.6 only requires law enforcement agencies to "make an inquiry with the national crime information center and any statewide Missouri law enforcement computer system to determine if the abandoned property has been reported as stolen," and to *initiate an inquiry* with DOR by submitting a crime inquiry and inspection report. Nothing in the statute required the Independence Police Department to determine the truck's ownership from Department of Revenue records before authorizing Autobot to tow it. From all that appears, the Independence Police Department may have identified Gladstone Dodge as the vehicle's owner in the Authorization to Tow simply because Gladstone Dodge was the entity which reported the truck stolen.

Although it is not referenced in Autobot's Brief, its Manager testified at trial that DOR reported to Autobot that the Department's records did not identify any owner of the truck. Although the record is not entirely clear, it appears that DOR made this report to Autobot in response to a crime inquiry and inspection report submitted by the Independence Police Department. The DOR report was admitted at trial as Exhibit 6, but is not contained in the record on appeal.

Autobot's Manager acknowledged that, consistent with § 304.156.3, the DOR report advised Autobot that it should conduct further investigations to try to determine the truck's owner. Despite the requirements of § 304.156.3, and the Department of Revenue's advice, Manager testified that Autobot chose to simply rely on the ownership information which had been previously supplied by the Independence Police Department. The following colloquy occurred during Manager's examination by Insurer's counsel:

> Q. Let's get back to Exhibit 6 then.
>
> A. Okay.
>
> Q. Doesn't it say that you're supposed to do an investigation to try to locate information concerning who might own the vehicle when the D O R records don't reveal anything?
>
> A. We were 100 percent positive it was Gladstone Dodge because that's where –
>
> Q. That's not the question I asked, sir. Doesn't the D O R advise you to do an investigation to try to find out who the titled owner is if their records do not show that information?
>
> A. This wasn't a private tow. It was towed in by people that do investigations, meaning the police. If it's a stolen vehicle, it would've shown owned by Gladstone Dodge. We notified Gladstone Dodge per the police department and that's what we're supposed to do.

Q. Didn't that record indicate there was no ownership information?

A. It had a certificate of origin. It was a brand new truck. You can't –

Q. No.

A. – give a title when –

Q. Did you do any other investigation concerning it other than just rely upon the police report? Is that all you relied upon?

A. I'm pretty sure I had detectives do an investigation. And they're the ones that told me Gladstone Dodge owned it. Do you want me to call real investigators liars?

The circuit court had substantial evidence from which it could find that Autobot failed to engage in the statutorily required efforts to identify the truck's owner, and therefore failed to satisfy its statutory obligation to notify the owner of the truck's whereabouts, and the procedures for recovering it. "A party seeking to deprive an owner of his or her property rights pursuant to a statute must, among other obligations, comply with the notice requirements contained in the statute." *Amond*, 302 S.W.3d at 714 (citations omitted). Based on the evidence of Autobot's failure to comply with the notice provisions of § 304.156, the circuit court would be entitled to conclude that Autobot was not authorized to dispose of the truck under §§ 304.155 and 304.156.

**B.**

Separately, the evidence at trial indicates that Autobot did not dispose of the truck in a manner authorized by § 304.155.12.

Autobot did not apply for title to the truck, as permitted by § 304.156.7. Instead, Autobot chose to sell the vehicle for scrap, as authorized by § 304.155.12. Section 304.155.12 provides that

12

any towing company *who has complied with the notification provisions in section 304.156* including notice that any property remaining unredeemed after thirty days may be sold as scrap property may then dispose of such property as provided in this subsection. Such sale shall only occur if at least thirty days has passed since the date of such notification, [and] the abandoned property remains unredeemed with no satisfactory arrangements made with the towing company for continued storage . . . . The towing company may dispose of such abandoned property by selling the property on a bill of sale as prescribed by the director of revenue *to a scrap metal operator or licensed salvage dealer for destruction purposes only.* The towing company shall forward a copy of the bill of sale provided by the scrap metal operator or licensed salvage dealer to the director of revenue within two weeks of the date of such sale.

(Emphasis added.)

The evidence indicates that Autobot failed to comply with § 304.155.12 in two respects. First, as discussed in § I.A above, the evidence indicates that Autobot had *not* "complied with the notification provisions in section 304.156." Second, § 304.155.12 provides that a towing company may only sell an abandoned vehicle using a bill of sale if the sale is to "a scrap metal operator or licensed salvage dealer for destruction purposes only." Autobot's Manager testified that the truck's buyer was "this unlucky person that came in to buy it" in response to a Facebook Marketplace ad. Manager's testimony supports a finding that Autobot failed to comply with § 304.155.12 because it did not sell the truck to a scrap metal operator or licensed salvage dealer for destruction purposes.

Point I is denied.

## II.

In its second Point, Autobot argues that the circuit court's finding that Insurer sustained damages of $35,015 was not supported by substantial evidence.

13

"The measure of damages for the conversion of personal property is the fair market value at the time and place of the conversion." *Mackey v. Goslee*, 244 S.W.3d 261, 264 (Mo. App. S.D. 2008) (citation omitted). The amount of damages awarded by the court need not be a specific figure suggested by the parties, but may instead be "within the range of values testified to at trial[.]" *Sleepy Hollow Ranch LLC v. Robinson*, 373 S.W.3d 485, 498 (Mo. App. S.D. 2012) (citing *Theilen v. Theilen*, 847 S.W.2d 116, 118-19 (Mo. App. W.D. 1992)).

Autobot and Insurer both presented evidence about the fair market value of the truck. Insurer's Representative testified, without objection, that the truck was worth $55,722 – the value Insurer ascribed to the truck when resolving Gladstone Dodge's insurance claim. Insurer also presented evidence, from a J.D. Powers Valuation Services report, that the truck was worth somewhere in the range from $45,015 to $66,275, depending on its precise condition, and the circumstances under which it was valued (retail price, auction price, loan value, etc.).

For its part, Autobot's Manager testified that he considered the truck to be a total loss, capable of being sold only for scrap. Manager testified to extensive damage to the truck, and the substantial cost of some of the repairs he believed would be necessary for the truck to be driveable and presentable. The photographs of the truck admitted into evidence may call into question Manager's testimony that the truck had sustained significant body damage. Moreover, the police video showing the truck traveling at a high rate of speed undercuts Manager's testimony that the truck's engine was inoperable, and would need to be replaced.

14

In the face of this conflicting testimony, the circuit court was entitled to weigh the evidence, and determine an appropriate fair market value "within the range of values testified to at trial." We presume the circuit court found the values reflected in Insurer's evidence to be somewhat inflated, and/or found that the truck had sustained some degree of damage which diminished its value (although not damage as severe as that to which Autobot's Manager testified).

The circuit court's damage award is supported by substantial evidence. Point II is denied.

## Conclusion

The judgment of the circuit court is affirmed.

_____
Alok Ahuja, Judge

All concur.

15